**Alta Oveta MIMS et al., Plaintiffs,**

v.

**The DUVAL COUNTY SCHOOL BOARD, a body corporate, et al., Defendants.**

**Civ. No. 4598.**

United States District Court,
M. D. Florida,
Jacksonville Division.

June 23, 1971.

Drew S. Days, III, New York City, Norris D. Woolfork, III, Orlando, Fla., for plaintiffs.

Yardley D. Buckman, Jacksonville, Fla., for defendants.

## MEMORANDUM OPINION AND FINAL JUDGMENT

TJOFLAT, District Judge.

This case is here on remand from the United States Court of Appeals for the Fifth Circuit. This Court is instructed to enter a final judgment setting forth a plan for the assignment of students in the Duval County school system consistent with the dictates of the Supreme Court's decision in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). That case requires the immediate elimination of the vestiges of the *de jure* segregated school system in Duval County.

In undertaking this task, it is necessary to review the history of the school system and the previous attempts to desegregate it. Prior to 1954 it was traditional in Florida, as in other states in the South, to operate separate public schools for blacks and whites. The Florida Constitution of 1885, Article 12, Section 12, F.S.A., specified that "White and colored children shall not be taught in the same school, but impartial provision shall be made for both." This concept of "separate-but-equal" schools was later approved by the Supreme Court of the United States in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

Pursuant to the 1885 Constitution, the Florida Legislature, by statute, prohibited the teaching of white persons and Negroes in the same building or classes in any public, private or parochial school.[1] Another enactment required school boards to establish separate attendance zones for white and Negro students.[2] Even though children lived in the same "neighborhood", they were required to attend separate schools. There was no such thing as a "neighborhood school" for all the children in the neighborhood. The idea of separation was so entrenched that school superintendents were required "to keep separately the books * * * used in white and Negro schools."[3] It was under this body of law that schools were operated in Duval County.

The legal foundation for this tradition of separate schools for the white and Negro races suddenly collapsed on May 17, 1954, with the Supreme Court's decision in Brown v. Board of Education.[4] Overturning the Plessy v. Ferguson "separate-but-equal" doctrine, the Court held that state-imposed segregation of children in public schools, solely on the basis of race, violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. The Court declared that "segregation of white and colored children in public schools has a detrimental effect upon the colored children" and "has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly]-integrated school system."[5] A year later, in the second *Brown* decision, the Court commanded all affected school boards to "effectuate a transition to a racially nondiscriminatory school system" and to admit their pupils to schools "on a racially nondiscriminatory basis *with all deliberate speed.*"[6] Almost six years passed, however, before any steps were taken to integrate the Duval County schools.

1. Section 228.09, Florida Statutes, F.S.A.

2. Section 230.23(4) (a), Florida Statutes, F.S.A.

3. Section 233.43(3), Florida Statutes, F.S.A.

4. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.

5. 347 U.S. at 494, 74 S.Ct. at 691.

6. 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (emphasis added).

## THE DUVAL COUNTY SCHOOL DESEGREGATION CASE

On December 6, 1960, this case commenced under the name: Braxton, et al. v. The Board of Public Instruction of Duval County, Florida, et al. In their complaint the *Braxton* plaintiffs alleged that Duval County maintained 113 totally segregated schools—89 white and 24 black; that the white schools were staffed by white principals and teachers; that the black schools were staffed by Negroes; and that the Superintendent's office was racially structured. The defendant School Board and Superintendent admitted the operation of a dual school system. On the basis of this admission and the facts revealed at the evidentiary hearing, then District Judge Bryan Simpson, in his order of August 21, 1962, found that the School Board and Superintendent

> have pursued and are presently pursuing a policy * * * of operating the public school system of Duval County on a racially segregated basis * * *. In the eight (8) years since the first *Brown* decision [they] have not operated any plan whatever for eliminating racial discrimination in the public school system committed to them for administration.

He went on to hold that

> The plaintiffs possess the right, arising under the due process and equal protection clauses of the Fourteenth Amendment * * * to have that system operated on a non-racial basis. This includes * * * the construction, designation, maintenance and operation of a single, non-racial system of schools. The last is to say that no schools may be constructed, designated, maintained and operated * * * for white pupils only, nor may any school be constructed, designated, maintained and operated for Negro pupils only.

Accordingly, the defendants were permanently enjoined from continuing to operate a compulsory bi-racial school system in Duval County and were ordered to submit to the Court "a complete plan for the removal of dual attendance zones for the system-wide opening of all schools on a non-racial basis." [7]

The School Board's plan, filed with the Court on October 30, 1962, provided for a "single system of geographical school districts", drawn around the various schools in the county. Beginning September, 1964, the children in the first and second grades in each district were to attend the school in their district. In September, 1965, and every year thereafter, one additional grade would be integrated in each district so that by 1974 all twelve grades would be integrated. At the same time, each child in the county was given "freedom of choice", that is, the right to "apply for admission to or transfer to the school of his or her choice." An order implementing this plan was entered by Judge Simpson on May 8, 1963. [8]

On March 19, 1965, plaintiffs complained that under the grade-a-year plan "only sixty Negro children out of a total Negro student population exceeding 30,000 are attending schools in desegregated situations. [No white student was attending a black school.] Negro high school students living in Baldwin * * * are still required to travel to a Negro high school in Jacksonville, a distance of twenty miles * * *. Negro students are required to travel from * * * Jacksonville Beach and Atlantic Beach to the City of Jacksonville to attend a Negro school although white schools, which they otherwise qualify to attend, are maintained [in Baldwin and] at said beaches * * *." On July 9, 1965, the defendant School Board and Superintendent consented to the entry of an order accelerating the planned desegregation so that the first four grades of each ele-

7. The District Court decree was affirmed on appeal: Board of Public Instruction of Duval County, Fla. v. Braxton, 326 F.2d 616 (5th Cir. 1964).

8. The Braxton plaintiffs thereafter applied to the Court for an order ac-
celerating the grade-a-year plan to include grades one through six in all elementary schools for the years 1964 and 1965, but that application was denied on August 13, 1964.

mentary school would be integrated for the 1965–66 school year and all six elementary grades for the 1966–67 school year.

By January, 1967, however, it was apparent that the school board plan was failing to accomplish the objective of establishing a unitary school system. As Judge Simpson found

1. In pursuance of this Court's decree herein dated August 21, 1962, defendants have established geographical school districts or attendance areas for the desegregated grades of the schools of Duval County * * *. It is clear * * * that, in a number of instances, the attendance areas are so defined that they absolutely prevent any school desegregation whatever, or permit only the most "token" integration.

Moreover, defendants make no initial assignments of white or Negro students to schools attended only or primarily by students of the opposite race. White students residing in the district or attendance area of Negro schools are not required to attend such schools, but they are assigned to or freely permitted transfers to other white schools. Similarly, Negro students residing in the district or attendance area of white schools are not permitted to attend such schools, but they are assigned to, or freely permitted transfers to, other Negro schools.

Negro elementary schools continue to "feed" into Negro junior high schools which in turn "feed" into Negro high schools. White elementary schools continue to "feed" only into white junior high schools, and these in turn, into white high schools.

2. Defendants continue to assign to Negro schools all Negro students not yet desegregated (grades seven through twelve) in accordance with their plan of desegregation. Defendants' desegregation plan provides for

desegregation of grades one through six by the present school year, 1966–1967, and thereafter, one additional grade each year until complete desegregation is achieved [that is, the school year 1972–1973 for the twelfth grade].

Negro high school students residing in the township of Baldwin, Florida, are assigned to a Negro high school in Jacksonville, Florida, a distance of twenty miles, although defendants operate a high school in Baldwin for white students. Negro high school students residing in the beach cities of Duval County, and in the New Berlin and Mayport sections of the county, are also assigned to Negro schools further from their homes than are certain white schools * * *.

4. In September of 1965, approximately 118,000 students of which about 30,000 were Negro were enrolled in the public schools of Duval County, Florida. Approximately 137 Negro students [.0045 of the total number of Negro pupils in Duval County] were attending twelve previously all white schools. No white student attended any Negro school.

5. Defendants continue to assign instructional personnel on the basis of race. There is no white member of the faculty of any Negro school, and no Negro member of the faculty of any white school.[9]

The Court therefore ordered the establishment of a single system of nonracial attendance zones for all grades. The School Board was directed to draw these zones in a fashion that would eliminate the segregated schools. Furthermore, the order effectively abolished the "freedom of choice" concept by providing a "majority to minority" transfer policy which would enable a Negro in a predominantly black school to transfer to a white school where he would be in a minority. The "freedom of choice" concept had proved to be a useless device to achieve integration. Instead, it had

9. Order entered January 24, 1967. This order was affirmed on appeal: Board of Public Instruction of Duval County, Fla. v. Braxton, 402 F.2d 900 (5th Cir. 1968).

perpetuated the segregated system by enabling, for example, a white student, living in a school zone populated by Negroes, to "choose" to attend a white school in another school zone.

The School Board failed to comply with Judge Simpson's order. In August of that year he observed:

> It is convincing on the record before me that the defendant Board, the individual members thereof, the defendant Brant, and the subordinate employee personnel of said defendants, are either incapable or unwilling to undertake full and meaningful compliance with either the strict tenor or the broad objectives of the provisions of the January 24, 1967 Order.[10]

Accordingly, he directed the School Board and the Superintendent to request the United States Department of Health, Education and Welfare, South Florida Desegregation Center, located at the University of Miami, to study the school system and to recommend a plan calculated to end racial discrimination in the Duval County schools. The desegregation center's report and recommendations were filed with the Court on January 8, 1969. On August 29, 1969, Judge William A. McRae, Jr., ordered the Board to submit by December 1, 1969, "a comprehensive desegregation plan formulated to achieve the necessary total racial unification of the school system * * *."[11]

Concomitant with the filing of the Board's amended plan of integration, a dramatic new dimension was added to the case with the *en banc* decision of the United States Court of Appeals for the Fifth Circuit in Singleton v. Jackson Municipal Separate School Dist.[12] On December 1, 1969, the Court, following the Supreme Court decision in Alexander v. Holmes County Board of Education,[13] announced that the public schools must commence operating unitary systems *immediately*. It said that "converting to a unitary system [involves] basically the merger of faculty and staff, students, transportation, services, athletic and other extra-curricular school activities."[14]

The Court of Appeals directed that the conversion to a unitary system take place in two steps. The first step, to be accomplished by February 1, 1970, involved the desegregation of faculty and other staff so that the ratio of Negro to white teachers in each school would reflect the ratio of the Negro to white teachers in the system as a whole. The second step contemplated student attendance plans so as to merge the student bodies into a unitary system by the start of the Fall, 1970, school term. On December 30, 1969, Judge McRae, following the dictates of the *Singleton* decision, ordered the reassignment of teachers and staff to achieve the required ratio, that is, 70% white and 30% black, in each Duval County school. In a supplemental order, entered January 19, 1970, he requested the Florida School Desegregation Center to determine the procedures necessary fully to desegregate the system.

On August 4, 1970, at a hearing convened to consider the report of the Center and to determine what further steps should be taken for the 1970–71 school

---

10. Order entered August 22, 1967.

11. By this time, the forms of government previously existing in Duval County and the City of Jacksonville had been abolished by referendum and had been replaced by a new government: the Consolidated City of Jacksonville. Under the new consolidated government the school board was restructured and consisted of seven non-partisan, non-paid members, each elected from two of the fourteen city council districts into which the city had been divided in keeping with the "one man—one vote" rule. In January, 1969, the new Board designated Dr. Cecil D. Hardesty as the first appointed school superintendent in the history of the Duval County school system. The new School Board and Dr. Hardesty, as Superintendent, were substituted as parties defendant in this case, in the place of the former Board and Ish Brant, the previous Superintendent.

12. 419 F.2d 1211 (5th Cir. 1969)

13. 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969)

14. 419 F.2d at 1216

year, Judge McRae announced there could not be a unitary system without desegregating substantially all the 27 black schools still existing within the county. Two days later he ordered the desegregation of every Negro elementary school with an attendance zone adjacent to a predominantly white school, utilizing pairing and clustering techniques previously approved by the Court of Appeals.[15]

The order did not disturb eighteen black schools in the core city. The School Board appealed that order to the Fifth Circuit Court of Appeals. The plaintiffs cross-appealed, asking that the case be remanded to this Court for the purpose of applying the same integration techniques to the unaffected schools. While the appeal was pending disposition, the Supreme Court decided the *Charlotte-Mecklenburg* case.

### THE IMPACT OF CHARLOTTE-MECKLENBURG

*Charlotte-Mecklenburg* is "the mandate to eliminate dual [school] systems and establish unitary systems at once." [16] The Supreme Court reiterated its pronouncement in Green v. County School Board [17] that

'The burden on a school board today is to come forward with a plan which promises realistically to work * * * *now* * * * until it is clear that state-imposed segregation has been completely removed [391 U.S. at 439, 88 S.Ct. 1689, 1694] * * * [and] racial discrimination [is] eliminated root and branch.' [18]

In *Green* the Court had instructed the board to "formulate a new plan * * * which promise[s] realistically to convert

promptly to a system without a 'white' school and a 'Negro' school, but just schools." [19]

■ The subject of one-race schools was dealt with expressly in *Charlotte-Mecklenburg*. The Court indicated that one-race schools will not be tolerated in a unitary system unless the school authorities can "satisfy the court that their racial composition is not the result of present or past discriminatory action." [20] In a system with a history of segregation, as in Duval County, there is a presumption against the legitimacy of substantially one race schools.

The Duval County school system is the thirteenth largest in the nation. The Consolidated City of Jacksonville, whose schools make up the system, has the largest geographic area of any city in the United States. With 840 square miles, it is two-thirds the size of the State of Rhode Island.

During the 1970–71 school year the system had 122,549 students of which approximately 72% were white and 28% were black. They were educated in 100 elementary schools, 22 junior high schools, one junior-senior high school, 13 senior high schools, and one technical high school. Eighteen of these schools are characterized as black: 12 elementary, four junior high and two senior high schools. Black or virtually all-black schools housed 54% of the Negro children at the elementary level, 54% at the junior high level, and 57% at the senior high school level. As indicated previously, these Negro schools lie in the core city. Almost none of them are in zones or neighborhoods adjacent to white zones or neighborhoods. By and large, they are separated by a gray area consisting

15. See, for example: Mannings v. Board of Public Instruction of Hillsborough County, 427 F.2d 874 (5th Cir. 1970); Andrews v. City of Monroe, 425 F.2d 1017 (5th Cir. 1970); United States of America v. Board of Trustees of Crosby Independent School Dist., 424 F.2d 625 (5th Cir. 1970); and Valley v. Rapides Parish School Board, 423 F.2d 1132 (5th Cir. 1970).

16. 402 U.S. 6, 91 S.Ct. at 1271.

17. 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1967).

18. 402 U.S. 13, 91 S.Ct. at 1275.

19. 391 U.S. at 441, 88 S.Ct. at 1696.

20. 402 U.S. 26, 91 S.Ct. at 1281.

of the school zones which were paired or clustered under Judge McRae's August 6, 1970, order. No one has suggested— and indeed there is no way—to integrate these core-city students with the white students outside of the gray perimeter without transporting some of them by bus.

No one argues that the 18 black core-city schools are anything but the vestiges of a *de jure* segregated dual school system. Under the circumstances here present, *Charlotte-Mecklenburg* literally commands the integration of these core-city students with the outlying white students through busing.

### THE SCHOOL BOARD PLAN

Following the publication of the *Charlotte-Mecklenburg* decision, the attorneys for the parties, the Chairman of the School Board, and the Superintendent, Dr. Cecil D. Hardesty, met in Atlanta with members of the Court of Appeals panel, to whom the case had been assigned on appeal, to explore whether the controversy could be settled by mutual agreement. The parties returned to Jacksonville to negotiate the terms of a possible settlement to be incorporated in a consent final judgment. It was in this context and for this purpose that the school board plan, now before the Court, came to fruition. When negotiations subsequently reached an impasse, the Court of Appeals remanded the case for further evidentiary hearings and the entry of a final judgment.

For the purpose of drawing a plan for the assignment of students to the Duval County schools on a non-racial basis, this Court has before it (1) the school board plan, (2) the prior record in this case from 1960 to present, (3) the stipulations of the parties and the evidence presented at the pre-trial conference on June 10, 1971, and the hearings held in open court on June 15 and 16, 1971,[21] (4) the argument of counsel, and (5) the presentations of *amicus curiae*.[22]

It is appropriate, in fashioning the remedy in this case, initially to consider the School Board's plan, for it is that body which has the primary responsibility under the law for solving the problem of desegregation.[23]

For the reasons that follow, this plan shall serve as the foundation for the remedial provisions of this judgment. As devised, the plan treats desegregation of the elementary, junior high, and senior high schools separately. Accordingly, they will be discussed in that order.

### The Elementary Schools

The plan satisfactorily desegregates every elementary school in the system. That fact is undisputed. Through the technique of clustering, each elementary school would have a student body with 24%–34% Negroes.[24]

The plan provides for two types of clusters, called Group "A" and Group "B", drawn with a view to achieving a fair integration ratio with the least amount of transportation. Group "A" consists of eight clusters, each including from three to six schools and providing schooling in grades one through six. Group "B" consists of 12 clusters, having three to seven schools each. It differs from Group "A" in that its clusters pro-

21. Prior to the pre-trial conference the parties stipulated that the Court view the schools in the Duval County system. This was done for the purpose of giving the Court a better understanding of the record previously compiled and the evidence adduced at the final hearing.

22. Counsel for Duval Teachers Association and for Jacksonville Council for Creative Curriculum, respectively, were granted leave of Court to appear *amicus curiae*.

23. Swann v. Charlotte-Mecklenburg, supra, 91 S.Ct. at 1275.

24. The only elementary school not involved in clustering is Mamie Agnes Jones (#236), located in Baldwin. It is so isolated that to merge it with another school would not be feasible. In any event this is of no moment because the school is fully integrated, having a white-black percentage ratio of 78–22, and the vestiges of the dual school system in the Baldwin area have been eliminated.

vide schooling for grades one to five only. The sixth grade is to be taught in elementary school buildings to be called "sixth grade centers." They are located in predominantly Negro neighborhoods.

The plaintiffs do not object to this concept of merging school zones or to the idea of grade centers. In fact, they have no real objection whatever to the Group "A" clusterings. Essentially, those clusterings include the schools paired or clustered by Judge McRae's August 6, 1970, order. The School Board's plan augments them by incorporating adjacent white schools into the existing clusters, thus making the black-white ratio in each school more equitable.[25]

█ The plaintiffs' chief complaint is addressed to the Group "B" clusters and to the Board's proposal to close seven elementary schools in the core-city ghetto.[26] They say that requiring the Group "B" Negro children to ride a bus to the first five grades at formerly white schools—while the whites would ride only to the sixth grade centers—would place an unconscionable, if not unconstitutional, burden on black students. Their two arguments (1) that the races should be bused equally at each grade level and (2) that if black schools are to be closed, white schools must be also, will be treated inversely.

The schools the Board would close are located in the black ghetto. They are Fairfield Elementary (#9); Isaiah Blocker (#135); A. L. Lewis (#105); East Jacksonville Elementary (#3); Forest Park (#104); Mt. Herman (#164) and John E. Ford (#154). It was only after plaintiffs' own expert admitted, at the final hearing, that Fairfield Elementary (#9), Isaiah Blocker (#135) and A. L. Lewis (#105) ought to be abandoned, that plaintiffs were willing to stipulate to the closing of those schools. The stipulation was well made, for the evidence demands that those three schools be closed. As for the other four schools, plaintiffs' counsel was unwilling to make a similar concession. His persistent argument—that the Board's decision to close them is arbitrary and unfounded—leaves the Court with no alternative but to discuss the evidence.

The South Florida Desegregation Center, in its July 31, 1968, report on the Duval County schools, recommended that East Jacksonville Elementary (#3) "should be abandoned as soon as possible."[27] The Center concluded that the building was "clearly unsuitable for educational purposes and should be phased out."[28] Plaintiffs' expert witness stated that the school premises would have to be expanded and the neighborhood would require a major "face-lifting" before he could recommend the building as fit for elementary educational purposes.

The South Florida Desegregation Center described Forest Park (#104) in these words: "One Negro school is par-

---

25. For example: Judge McRae's order paired North Shore (#70) and Long Branch (#106), resulting in an attendance at the two schools of 636 whites and 799 Negroes, i. e., 44% white and 56% black. The School Board's plan would add Beulah Beal (#11), Lola Culver (#13) and Louis Sheffield (#242) to North Shore and Long Branch. This would change the ratio so that the five clustered schools would have an attendance of approximately 70% white and 30% Negro.

26. The Board also proposed the closing of an eighth elementary school, Smart Pope Livingston (#149), and the conversion of Grand Park (#14) to an Exceptional Child Education Center. At the final hearing the Superintendent indicated that, after reconsidering the matter, it was the consensus judgment of his staff that Smart Pope Livingston (#149) should not be closed and that it should be employed as a sixth grade center. As for Grand Park (#14), no testimony was offered by plaintiffs to rebut the Board's decision.

27. A report to the Duval County Board of Public Instruction. Florida School Desegregation Consulting Center, University of Miami, July 31, 1968, at page 205.

28. A report to the Duval County Board of Public Instruction, supra, at 117.

ticularly displeasing in terms of location. Forest Park Elementary No. 104 is a large (1,080 capacity), relatively new building on a 1.72 acre site. The school is 'surrounded by a City incinerator on the East, a polluted creek on the North, and a meat and poultry (abattoir) company on the West. This has caused a serious problem with regard to stench and sewage backing up in the school plant'." [29] In urging that this school should remain open, the attorney for plaintiffs presented evidence that the incinerator was no longer in operation. However that may be, it is undisputed that the slaughter house and McCoy's Creek are still producing highly noxious odors which even permeate the school cafeteria.

Mt. Herman (#164) and John E. Ford (#154) abut the fence on the West edge of the I-95 Expressway where it passes through the core-city ghetto. Across the Expressway lie Isaiah Blocker (#135) and Darnell-Cookman Junior High School (#145). These schools are located in the area of the highest crime rate in the city, where 80% of the hard narcotics are trafficked. Influences in the neighborhood make quality education at these schools a virtual impossibility. The school buildings are frequently invaded during school hours by vandals and troublemakers, mostly consisting of truants and teenage drop-outs. Fences and locked gates have been no deterrent, nor have "administrative assistants" whose sole function is to patrol the halls. It is customary to lock the teachers and students in the classrooms for their safety. Even this procedure has not precluded assaults on teachers and students. The conditions are such that the Superintendent has been unable to maintain a sufficient number of certified white teachers at any of these schools to comply with the 70–30 white-black teacher ratio.

In sum, this Court finds that the School Board acted in good faith in resolving to close the seven elementary schools. [30] The action does not constitute invidious discrimination proscribed by the Fourteenth Amendment. The closing of these schools "is simply a reasonable part of a workable plan of desegregation." [31]

■ In their second argument plaintiffs seek to have this Court require the School Board to bus white children to the core city for all elementary grades, not just to sixth grade centers, so to achieve equal busing of the races. The United States Court of Appeals for the Fourth Circuit resolved the same argument in Allen v. Asheville City Board of Education [32] with these words:

We are asked to decide whether the district court, in approving the plan, unconstitutionally placed 'the burden of desegregation' upon black pupils in the school system. It is urged upon us that the plan approved by the district court 'places an unfair, racially discriminatory burden upon black children' in that black children in grades 1 through 5 who previously attended all-black Livingston and Herring Elementary Schools will be required to travel as much as five or six miles in order to attend previously all-white schools. This is said to be an unfair allocation of the 'burden' of integration, and it is suggested that the Constitution requires that an equivalent number or proportion of white children in the same grades be required to travel an equivalent distance to enter schools outside their previous attendance zones.

We hold that such a pattern of assignment implemented by free school bus

---

29. A report to the Duval County Board of Public Instruction, supra, at 117.

30. There is a sharp contrast between the schools to be closed and those in the black community to be left open. The latter, including the schools to be employed as sixth grade centers, are lo-cated on better sites and the overall conditions are good for quality education.

31. Carr v. Montgomery County Board of Education, 429 F.2d 382, 385 (5th Cir. 1970).

32. 434 F.2d 902, 907 (4th Cir. 1970).

transportation does not violate the equal protection clause of the Fourteenth Amendment.

The *rationale* in the Second Circuit is essentially the same. In Norwalk Core v. Norwalk Board of Education,[33] the Court noted:

Plaintiffs would eliminate what they call unequal treatment by having, in effect, one white child bussed out of his neighborhood for every black child bussed out of his—in other words, deprive as many whites of neighborhood advantages as blacks are deprived by being bussed to schools predominantly white. But the problem is not as simple as a one black, one white ratio. It is a question of the Board, with the facilities available having 'acted in the utmost good faith, in a nonarbitrary and deliberate manner, in order both to insure racial balance and to provide high quality education'. * * *

There is ample evidence in the record to support the conclusion of the Board, the Superintendent, and his staff that the education of the black children in the white schools is consistent with sound educational principles and will be beneficial to the children concerned. The sixth grade center concept is equally calculated to produce quality education and to provide a healthy transition from primary to secondary schools. The Court therefore finds that the plan in this respect is well within the limits of the Board's administrative discretion and shall not be disturbed.

■ As already noted, the Board's plan affords equal treatment to all sections of Duval County in terms of pupil attendance ratios. It was drawn with an obvious intent to be fair, and the School Board and Superintendent are to be commended. At the final hearing, however, evidence was presented which indicates that the busing required to effectuate the Group "B" cluster of the beaches schools and John E. Ford (#154) in the core city would impose an undue hardship upon the children involved. At the time the plan was formulated the distance between the beaches and the inner-city was common knowledge, but the time it would take a school bus to traverse that distance, especially at the peak rush hours, was not known. Studies made at the Court's request show that it would take as much as an hour and a half to transport sixth graders more than twenty-one miles from the beaches to a downtown sixth grade center.[34] The situation is aggravated by traffic jams at the St. John's River toll bridges which link the beaches with downtown Jacksonville. This evidence mitigates against the clustering of elementary schools at the beaches with a core-city black school.

Another reason for excluding the beaches is that a unitary system can be created there, without the necessity of busing Negro students from the core city, by altering attendance patterns. The racial discrimination that characterized education at the beach communities was that the Negro children attended an all-black elementary school; and, thereafter, they were bused to Jacksonville to attend junior high school and senior high school. At the same time, the white students attended separate elementary schools and a combined all-white junior-senior high school, Duncan U. Fletcher. Segregation at the latter level has been eliminated with the recent complete integration of Fletcher (Jr. High #63 and Sr. High #223). By employing the clustering technique at the beach elementary schools, the remaining elements of discrimination will be eradicated. This will give those schools an average of 15% black students.[35] The Court finds that

33. 423 F.2d 121, 124 (2d Cir. 1970).

34. For example, the distance from Joseph Finegan (#247) to town is 21.4 miles. This does not include the distance the bus would travel while picking up the children.

35. There are six schools at the beaches. By clustering five of these schools: Atlantic Beach (#65); Mayport (#227); San Pablo (#80); Seabreeze (#225); and Jacksonville Beach (#144) the black student ratio would range from 14%–24%. Joseph Finegan (#247) would not

the beach schools, at all levels, should be treated separately from the rest of the county, and they will be dealt with accordingly.

*The Junior High Schools*

■ Of the 22 junior high schools and one junior-senior high school in the system, six are fully integrated and are not affected by the school board plan. They are: Baldwin Junior-Senior High School (#38); John Gorrie (#22); Kirby-Smith (#25); Landon (#31); Fletcher Junior High School (#63); and Paxon Junior High School (#92).[36] With the exception of Northwestern (#155) and Sandalwood (#237), the plan treats the remaining junior highs in much the same fashion as the elementary schools. By employing the techniques of clustering and grade centers, the students of 15 formerly one-race schools will be integrated into 14 unitary schools with 21% to 34% Negro students in each. Darnell-Cookman (#145), previously all black, will be closed.

As the Court has observed, that school is located in the midst of an extremely high crime rate area. Vice and hard narcotics are prevalent in the neighborhood. Intruders create the same disruption there as they do at the elementary schools that will be closed. The urban renewal program promises ultimately to rehabilitate the area and may eliminate these problems. It is hoped that the first stage of urban renewal, involving the area to the north and east of Darnell-Cookman, will be completed in two years; but there is no definite timetable with regard to the stage which is addressed to the worst and nearest portion of the neighborhood. *Charlotte-Mecklenburg* requires the desegregation of that school *now* and will permit no such delay. Future improvement of the area, as it may

relate to the reopening of Darnell-Cookman, is a matter within the province of the School Board to consider in due time. As for the present, the Court finds that the School Board's decision to close the school is justified.

■ The two remaining junior high schools are Sandalwood and Northwestern. Sandalwood is a new school which will open in September. Under the school board plan, it is projected to have 1,316 white students and 6 black students. Northwestern, built in 1957, would have 1,590 black students. The question is whether the Duval County schools can be characterized as a unitary school system with these two virtually one-race schools. *Charlotte-Mecklenburg* recognizes that:

> In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change. * * [I]t should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself, the mark of a system which still practices segregation by law.[37]

The Court finds and holds that the maintenance of Sandalwood and Northwestern as proposed is constitutionally permissible.

Sandalwood is situated in the extreme eastern portion of the county just west of the beach communities. The few Negroes in this section of the county will attend the school. To obtain a greater integration ratio would require busing blacks all the way from the inner-city, principally from the area serviced by Northwestern, to Sandalwood. Then to prevent double sessions at Sandalwood, its white students would have to be bused to Northwestern. This would involve the same impracticable bus routes that would

---

be paired or clustered because of its situation. It is located at the extreme north end of the beaches, juxtaposed with the Mayport Naval Base and the ocean. Ninety-five percent of the families served by this school live on the naval base.

36. The percentage of blacks in these schools is as follows: Baldwin, 16%; John Gorrie, 30%; Kirby-Smith, 35%; Landon, 24%; Fletcher, 11%; and Paxon, 34%.

37. 402 U.S. 25–26, 91 S.Ct. at 1281.

have been used had the Court required the cross-county busing of beaches and core-city elementary students. While the distance would not be quite as great, the same time-consuming factors would be present.

Northwestern is located in the center of the black community. It is miles from the nearest substantially white residential area. In the past its pupils came from all-black elementary schools, and its graduates went on to all-black Raines High School. Under the provisions of this final judgment, its future students will come from fully integrated grammar schools and will attend integrated high schools. There is no question as to the Board's good faith intention to provide the children in Northwestern's area an education in a non-racially discriminatory setting. Its all-black character is not the product of gerrymandering zone lines. The failure to pair or cluster Northwestern does not reflect a desire on the part of the Board to keep it segregated.

To link Northwestern to other junior high schools within a reasonable traveling distance would simply create more predominantly black schools. A satisfactory integration ratio could not be achieved; and, further, a demographic change to black would likely follow. In view of the fact that the School Board's overall plan of desegregation, as modified by this Court, will dismantle the dual school system in Duval County, any presumption that Sandalwood and Northwestern are the result of state-imposed racial discrimination has vanished.

*The Senior High Schools*

■ Duval County has 13 senior high schools. Two are all black: Raines

(#165); and Stanton (#153). The remainder had from 1% to 40% black enrollment during the 1970–71 school year.[38] The School Board's plan would convert Stanton to a vocational school, and integrate its student body. Stanton is the best suited of the high schools, in terms of equipment and personnel, for an extensive vocational program. One-third of its student body is already involved in vocational studies. The plan would concentrate this training at Stanton by drawing students of both races from all over the county.[39] The remaining two-thirds of the students at Stanton, currently enrolled in a college preparatory curriculum, would be transported to eight predominantly white schools. The Court finds that the Stanton proposal and the integration of its student body is a reasonable feature of the conversion to a unitary system.

■ With the exception of Ribault and Raines, which will be dealt with separately, the proposed integration of the high schools would establish black enrollments ranging from 7% to 40%.[40] Plaintiffs suggest that the ratio in each of these schools should be closer to the county-wide ratio of white to black, that is, 72%–28%. However, in a unitary system, as Duval County will have, the law does not require such adherence to a strict mathematical formula. "The racial ingredients of schools cannot be prescribed with such certainty of a correct optimum result as might be found in a gourmet cook book specifying the proper portions for a deluxe casserole." [41]

■ The School Board's proposed disposition of Raines and Ribault, however, will not square with the Constitution. They were built side by side to serve the

38. Paxon (#75), 40%; Jackson (#35), 34%; Ribault (#96), 26%; Lee (#33), 11%; Fletcher (#223), 11%; Wolfson (#224), 10%; Englewood (#90), 3%; Forrest (#241), 3%; White (#248), 3%; Terry Parker (#86), 2%; Sandalwood (#237), 1%.

39. A similar program has been in operation for some time at Technical High School (#57) which is fully integrated with 354 whites and 224 blacks.

40. With this distribution of the Stanton students, the resultant black percentages would be: Paxon, 40%; Jackson, 35%; Lee, 13%; Fletcher, 11%; Wolfson, 14%; Englewood, 13%; Forrest, 9%; White, 9%; Terry Parker, 7%; Sandalwood, 12%.

41. Norwalk Core v. Norwalk Board of Education, 423 F.2d 121, 122 (2d Cir. 1970).

populace in the north-northwest section of the county. A unitary system does not contemplate twin high schools—one for Negroes and one for whites. No one has seriously suggested that they are not vestiges of a dual system.

The solution is obvious. The schools must be paired, as equitably as possible, to serve their area of the community as one. That area of the county generally reflects a black-white ratio of approximately 58%–42%. With six additional school buses, the two schools can and will be integrated. With this change in the Board's proposal, the Court finds that a unitary system is achieved at the high school level.

The alternative prospect of cross-busing Raines students throughout the county, when integration can be achieved in its own backyard, staggers the imagination. The schedules of the times and distances that would be involved in busing of that magnitude are in the record and need not be set out here.

## THE COURT'S PLAN FROM THE STUDENTS' VIEWPOINT

The desegregation plan for Duval County is best understood when examined from a pupil's viewpoint. A black student can expect to spend his first five years of school attending an elementary school in a white neighborhood. His education during the sixth and seventh grades will occur in grade centers located in black neighborhoods. In all likelihood, he will return to a formerly white junior high school for the eighth and ninth grades. Finally, he would attend an integrated senior high school, which formerly may have been predominately black or white. The closing of some of the black elementary schools, previously discussed, will enhance quality education for *all* pupils.

A white student can expect to spend his first five years of school attending his neighborhood school. His education during the sixth and seventh grades will occur in grade centers located in black neighborhoods. He will then go to the junior high and senior high schools he would have attended had desegregation not been ordered.

In Baldwin and at the beaches, the students can expect to attend fully integrated schools there at the elementary, junior high and senior high levels.

## THE ACQUISITION OF SCHOOL BUSES

It will require 250 additional buses to transport the students under the desegregation plan. For many years the School Board has contracted with independent bus owners, all local residents, to provide, operate and maintain the necessary buses. At the present time, there are 149 of these local contractors. Almost without exception, a contractor purchases a bus, either new or used, by borrowing the purchase price and pledging his school board agreement as collateral.

The evidence is undisputed that the school bus manufacturers (the chassis and body are not made by the same manufacturer) cannot deliver the number of buses required until well into the next school year. There are, however, 100 used buses available which will meet all applicable safety regulations and which can be delivered by September. Accordingly, the Court will require the School Board to take the steps necessary to have those buses acquired in order that at least some portions of the desegregation plan can be put into operation. As for the 150 remaining, the Court notes that, in the event of an appeal, they may or may not be required. The Court deems it necessary and appropriate to delay their acquisition either until the time in which to appeal this case has expired or until the case has been resolved on appeal, whichever comes first. The stay is indicated because it is likely that the plaintiffs' attorney, his main arguments and approaches to integration having been rejected, will appeal this final judgment. If this Court is reversed on appeal, there is no telling how many buses will be necessary to effectuate another plan. This Court is confident that no matter what plan is adopted, the 100

buses to be ordered forthwith will be the minimum necessary. To require the purchase of an extra 150 buses (at around $10,000 per bus) under these circumstances might, in the final analysis, work an undue hardship on the School Board or the individual contractors and waste the taxpayers' money.

Ordered:

A. [clustering elementary schools]

B. [clustering junior high schools]

C. That William E. Raines (#165) and Ribault Sr. High School (#96) shall be paired, and each school shall have grades ten through twelve. (It is anticipated that the black enrollment at Raines will be 59% and 57% at Ribault.)

D. That Stanton High School (#153) shall be converted to a vocational and career training center for students throughout the Duval County school system. The high school's college preparatory students shall be transferred to the following high schools in accordance with the School Board's plan: Lee, Jackson, Terry Parker, Englewood, Wolfson, Sandalwood, Forrest, and White. The school shall commence operating as a vocational and career training center at the start of the 1971–72 school year.

E. That the following schools shall be closed forthwith: Forest Park Elementary (#104), East Jacksonville Elementary (#3), Fairfield Elementary (#9), A. L. Lewis Elementary (#105), Isaiah Blocker Elementary (#135), Mt. Herman (#164), John E. Ford Elementary (#154), and Darnell-Cookman Jr. High School (#145).

F. The "majority to minority transfer policy" provision set out in the order entered herein on December 30, 1969, shall remain in full force and effect, and the School Board shall provide free transportation to any student who exercises his right to transfer thereunder.

G. That the School Board shall forthwith take all steps necessary to acquire, either by itself or through contractors, the 100 used school buses referred to in this final judgment. Said buses shall

meet federal standards. As for the additional 150 buses mentioned herein, the School Board shall forthwith take all steps necessary to acquire, either by itself or through contractors, said buses either at such time as this case is disposed of on appeal or when the appeal time has expired without an appeal, whichever occurs first.

H. That all provisions of any order or judgment heretofore entered herein, which are inconsistent with this final judgment, are vacated. Otherwise, said orders and judgments shall remain in full force and effect.

I. That jurisdiction is retained to enter such orders for the enforcement of this final judgment as justice may require.