**JACKSONVILLE BRANCH, NAACP, Plaintiff–Appellant, Cross–Appellee,**

v.

**The DUVAL COUNTY SCHOOL BOARD, a body corporate, Defendant–Appellee, Cross–Appellant.**

**No. 88–3803.**

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1989.

Rehearing and Rehearing In Banc Denied Oct. 23, 1989.

Michael H. Sussman, Sussman & Sussman, Yonkers, N.Y., Edward A. Hailes, Jr., NAACP—Special Contribution Fund, Baltimore, Md., for plaintiff-appellant, cross-appellee.

Cindy A. Laquidara–Kenney, Jacksonville, Fla., Commander, Legler, Werber, Dawes, Sadler & Howell, P.A., Jacksonville, Fla., William Lee Allen, Asst. Counsel, Lee S. Carlin, Asst. Counsel, Jacksonville, Fla., for defendant-appellee, cross-appellant.

Before VANCE and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

VANCE, Circuit Judge:

This action was filed in April, 1985 by the Jacksonville branch of the NAACP ("NAACP") on behalf of all black schoolchildren in Duval County, Florida. The complaint alleged that defendant, the Duval County School Board ("Board"), had acted since 1975 to increase racial segregation in its public schools. The district court

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

consolidated this action with *Mims v. Duval County School Bd.*, a case which culminated in 1971 with the issuance of a permanent injunction requiring the Board to integrate the school system. *See Mims v. Duval County School Bd.*, 329 F.Supp. 123 (M.D.Fla.), *aff'd*, 447 F.2d 1330 (5th Cir. 1971). After a trial on the merits, the district court found that the Duval County school system has achieved unitary status within the meaning of *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and therefore dissolved the injunction. For the reasons stated below, we reverse.

## I. BACKGROUND

Legal efforts to dismantle Duval County's segregated school system began in 1960, when a lawsuit was filed seeking to compel the school board to comply with the mandate of *Brown v. Board of Educ.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*"Brown II"*), to effectuate an immediate transition to a racially nondiscriminatory system. In that case, *Braxton v. Board of Public Instruction of Duval County*, plaintiffs alleged that the county maintained 113 segregated schools, 89 white and 24 black. They alleged further that the white schools were staffed by white principals and teachers, that the black schools were staffed by blacks, and that the superintendent's office was racially structured. After conducting an evidentiary hearing, the district court enjoined defendants from operating segregated schools and ordered them to submit a plan for transition to an integrated system. The school board submitted a plan envisioning gradual integration, whereby one grade would be integrated each year so that complete desegregation would be achieved by 1974. The district court approved the plan on May 8, 1963.

In March 1965, plaintiffs objected to the slowness of the desegregation process, pointing out that under the plan only sixty of over 30,000 black children were attending white schools, and that no white student was attending a black school. The school board consented to an acceleration of the desegregation process, but by 1967 it was apparent that the plan was not working. The district court found that the board's assignment practices and attendance zones effectively prevented unification of the dual system. Consequently, the court directed the school board to establish a nondiscriminatory system of attendance zones, to abolish the "freedom of choice" plan then in effect, and to submit a revised plan contemplating the achievement of total desegregation.

The Board's formulation of a new plan was interrupted by the in banc decision of the former Fifth Circuit in *Singleton v. Jackson Mun. Separate School Dist.*, 419 F.2d 1211 (5th Cir.1969), *reversed in part*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970) (reversing authorization of delay in desegregation process beyond Feb. 1, 1970.) The court directed the immediate conversion of public school districts to unitary systems through "basically the merger of faculty and staff, students, transportation, services, athletic and other extra-curricular school activities." *Id.* at 1216. Step one of the conversion process entailed reassignment of faculty and staff so that the ratio of white teachers and staff to black teachers and staff in one school would reflect the ratio of white to black teachers and staff in the system as a whole. *Id.* at 1218. Following the dictates of *Singleton*, the district court in 1969 ordered the Board to reassign its teachers and staff to achieve the required ratio, 70% white to 30% black.

Since 1971, the school system has been subject to the permanent injunction set forth in former District Judge Tjoflat's memorandum opinion published at 329 F.Supp. 123 (*"Mims order"*). The *Mims* order required the Board: (1) to desegregate the elementary and junior high schools through the technique of clustering; (2) to integrate Ribault and Raines high schools, one-race schools located side by side, to reflect the 58% black population in that area of Duval County; (3) to convert Stanton High School, an all-black school, to a vocational training center; (4)

to close several elementary schools; (5) to retain the majority to minority transfer policy, which allowed a student in a school in which he was a member of the majority race to transfer to a school in which he would be a minority; (6) to acquire additional school buses; and (7) to continue to comply with the provisions of the 1969 injunction, including the provision requiring faculty and staff to be assigned to reflect the 70% white to 30% black ratio.

## II.  FACTS

The Duval County school district is geographically the largest school district in the United States.  Approximately 101,000 children, 65% of whom were white and 35% of whom were black, attended its more than 140 schools in 1984.  The black student population has increased by 7% since the 1971 *Mims* order.

### A.  *Administrative Assignments*

In the 1984–85 school year, approximately 25% of the system's administrative staff was black.  Of forty schools with administrative staffs composed of three or more persons in 1984–85, eighteen had staffs composed exclusively of members of one race.  In the same year, nine of seventeen high schools had all-white administrative staffs; of these nine schools, eight had student bodies which were over 80% white. One high school had an all-black administrative staff and black student population exceeding 98%.  Two other high schools had predominantly black administrative staffs and student bodies which were predominantly black.

At the junior high level, seven of twenty-two schools had all-white administrative staffs in 1984–85.  All but one of these schools had student populations which were approximately 70% white.  The exception was Fletcher Junior High School, whose student population was 94% white. One school, Ribault Junior High School, had an all-black staff; its student population was 73% black.

In 1985–86, twenty of ninety-six elementary school principals were black.  Nine of these twenty principals served at schools with a predominantly black student body. During that school year, the Board replaced or transferred twenty-four principals.  Twenty-three of the new principals replaced a person of the same race.

### B.  *Faculty Assignments*

The *Mims* injunction required the Board to assign faculty in a manner which reflected the racial composition of teachers in the district as a whole.  In 1969, the ratio of white teachers to black teachers was seventy to thirty.  Accordingly the court ordered the Board to ensure that each school's faculty was 70% white and 30% black, allowing for a 5% divergence in either direction.  In 1984, as in 1969, 70% of the system's teachers were white and 30% were black.  The faculty of thirty schools varied by more than 10% from the seventy/thirty ratio.  Thirteen varied by more than 20%.  This degree of variance has been consistent since the *Mims* order was handed down in 1972:

| Year | Number of schools with over 40% black teachers | Number of schools with under 20% black teachers |
|---|---|---|
| 1972 | 18 | 10 |
| 1973 | 19 | 7 |
| 1974 | 20 | 11 |
| 1975 | 22 | 10 |
| 1976 | 21 | 9 |
| 1977 | 19 | 6 |
| 1978 | 18 | 7 |
| 1979 | 24 | 12 |
| 1980 | 22 | 12 |
| 1981 | 18 | 10 |
| 1982 | 20 | 10 |
| 1983 | 17 | 11 |
| 1984 | 17 | 13 |

In 1984, schools having predominantly black faculties in many instances also had predominantly black student bodies.  At Ribault High School, for example, which has a 99% black student body, forty-seven of seventy-five teachers were black.  At Raines High School, 98% of the students and 59% of the teachers were black.  The pattern was reversed in schools with predominantly white student bodies.  At Fletcher High School, 10% of the students and four out of ninety-seven teachers were black.  At Wolfson High School, 9% of the students and 10% of the faculty were black.

### C. Department Chairpersons and Athletic Coaches

The race of a school's department chairpersons and its athletic coaches also tended to correspond to the racial makeup of the student body. In 1984, six schools had exclusively white department chairperson staffs. These six schools had over 80% white faculties and over 75% white student populations. The reverse was true for schools with disproportionately black student bodies. The race of coaching staffs also tended to parallel the racial composition of the faculties and student bodies.

### D. Student Assignments

Prior to the *Mims* injunction ninety-one of one hundred thirty-two schools in Duval County had student populations composed almost exclusively of one race. Eighteen of these were schools that were "black" under the state-imposed system of segregation. The *Mims* order contemplated black high school enrollments ranging from 7% to 40%, noting that the law did not require each school's student body to reflect precisely the white-to-black ratio in the district as a whole. *Mims* order, 329 F.Supp. at 135. With respect to two particular schools, however, the court "anticipated that the black enrollment at Raines will be 59% and 57% at Ribault." *Id.* at 137. The reason for this specificity regarding these two schools was that under the de jure system of segregation, one (Raines) was a "black school" and the other (Ribault), directly next door, was a "white school." Nevertheless, in the 1972–73 school year, Raines had a black student population of 79%; Ribault was 87% black in 1972 and was 99% black from 1976 until 1985.

In 1972, the year after Judge Tjoflat's order, eight schools in Duval County had student bodies that were more than 50% black. In 1985, that number had increased to twenty-seven schools out a total of one hundred forty schools. Eight schools, including Ribault and Raines which were both over 98% black, had a black or white population of over 95%.

Since 1972, without court approval, the Board has used portable buildings and leased additional space to accommodate overcrowding at some schools. Other schools were underpopulated. No studies were conducted to assess the potential impact of these practices on the school system's racial imbalances.

### E. Special Programs

The school district offers several programs, including a "gifted" program and educable mentally handicapped (EMH) classes, to accommodate students with special needs. From 1983 to 1985, 6.5% of the students enrolled in the gifted program were black, as contrasted with a 35% black population in the school system. During the 1984–85 school year, forty-two of forty-three teachers in the program were white.[1] None of the elementary schools that operate a gifted center is a majority black school. Students attending other schools who qualify for the program are transported to schools with gifted centers.

The process by which a student qualifies for the gifted program involves several steps. A student is recommended for initial screening by teachers, counselors, principals, parents, students, physicians, or community leaders. The student is given the Stanford Achievement Test, and if he or she scores in the 98th percentile in two subject areas he or she goes on to take the Otis Lennon School Ability Test. If the test confirms that the student has a deviation I.Q. of 125 or more, the student is recommended for at least three more tests which further evaluate his or her intelligence and behavioral characteristics. Finally, a Child Study Team, composed of the district's Director of Exceptional Student Education or the Director's representative, a student services representative and the child's principal, reviews the student's record and recommends placement.

---

1. The district court noted that the list of forty-three teachers appears to be incomplete, as it lists the teachers in alphabetical order and ends with a last name beginning with the letter "r".

Because the exhibit was introduced as a complete list and was received without any objection by the Board we will treat it as a comprehensive list.

The criteria employed by the district to determine eligibility for the program are more stringent than the state guidelines. The district's qualifying scores on the first two tests, for example, are higher than the state's. No evidence was presented that would give rise to the inference that the tests and methods used to assess a student's eligibility for the program had a discriminatory effect on black students, other than their statistical underrepresentation in the program. The Board has made efforts to increase black enrollment, including attempts to increase teacher and parental awareness of the program and to increase parents' role in the screening process.

In 1983, 72% of the students in the district's EMH program were black. The EMH program is operated in accordance with state guidelines. Referrals are usually made by teachers, whereafter the student is given a series of tests to assess intellectual ability and behavioral skills. Due to the overrepresentation of black students in the EMH program, the classification of minority students is subject to an additional level of review.

## III. DISCUSSION

█ The district court found that the Duval County school system has achieved unitary status and accordingly dissolved the injunction under which the school district had been operating since 1969. Appellant urges that we reverse this finding on the ground that the school district has not successfully eliminated the effects of the past system of state-imposed segregation. The critical question thus is under what circumstances judicial supervision must be terminated because the school district has achieved unitary status. The Supreme Court has not addressed this question. In several decisions, however, the Court de-scribes the substantive goals that school desegregation remedies should achieve to redress fully the harms resulting from the prior system of state-imposed segregation. Our analysis of these cases and our review of the record in this case convinces us that the Duval County School Board has not sufficiently eliminated the vestiges of its previously discriminatory system to entitle it to a declaration of unitary status.

█ In *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*"Brown I"*), the Supreme Court held that the maintenance of separate school systems for black and white students violates the equal protection clause of the Fourteenth Amendment and that school districts must operate one school system for all students. *Id.* at 495, 74 S.Ct. at 692; *see also Brown II*, 349 U.S. at 300–01, 75 S.Ct. at 756–57 (instructing school authorities how to comply with commands of *Brown I*.) In subsequent decisions, the Court explained that the ultimate obligation of school districts was to effect a "transition to a unitary, nonracial system of public education...." *Green v. County School Bd.*, 391 U.S. 430, 436, 88 S.Ct. 1689–93, 20 L.Ed.2d 716 (1968); *see also Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 20, 90 S.Ct. 29, 29–30, 24 L.Ed.2d 19 (1969). After a school system has successfully eliminated all vestiges of state-imposed segregation, *see Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. at 15, 91 S.Ct. at 1275–76, it attains unitary status [2] and court supervision is no longer warranted. *Swann*, 402 U.S. at 31–32, 91 S.Ct. at 1283–84.

The Court in *Green* confirmed that school districts operating segregated school systems were "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary

---

**2.** There has been some confusion in the lower courts surrounding the definition of "unitary." In *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1413 n. 12 (11th Cir.1985), we distinguished a unitary school system from a system that has achieved unitary status. A unitary system, we explained, is one which has not operated segregated schools for a period of several years. A system that has achieved unitary status is "one which is not only unitary but has eliminated the vestiges of its prior discrimination and has been adjudicated as such through the proper judicial procedures." *Id.* We retain this definitional distinction for purposes of this opinion. *Cf. United States v. Lawrence County School Dist.,* 799 F.2d 1031, 1037 (5th Cir.1986) (reconciling inconsistent uses of term "unitary").

school system in which racial discrimination would be eliminated root and branch." 391 U.S. at 437–38, 88 S.Ct. at 1694. *Swann* reiterated that the goal was to "eliminate from the public schools all vestiges of state-imposed segregation." 402 U.S. at 15, 91 S.Ct. at 1275–76. The Court pointed to the ability to identify the "race" of a school based upon the racial composition of its teachers and staff and the quality of its facilities and extracurricular activities as an indication of continued segregation. Because school authorities exercise extensive control over faculty and staff assignments and the allocation of resources, racial disproportionality in these areas is difficult to explain as other than the product of the prior state-imposed system of segregation:

> Independent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown.

*Id.* at 18, 91 S.Ct. at 1277. The existence of schools whose student bodies are composed almost entirely of one race constitutes less compelling evidence of continued segregation:

> [T]he existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law.... [B]ut in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition.

*Id.* at 26, 91 S.Ct. at 1281.

■ Once a prima facie case of continued segregation in a previously dual school system is established, the burden is upon the school authorities to show that such continued segregation is not the result of present or past discriminatory actions. *Id.*

"In discharging that burden, it is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not *among* the factors that motivated their actions." *Keyes v. School Dist.,* 413 U.S. 189, 210, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973) (emphasis added). The remoteness in time of the school authorities' intentionally discriminatory actions is irrelevant. In *Keyes,* the Court explained that

> If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less "intentional."

> ... Intentional school segregation in the past may have been a factor in creating a natural environment for the growth of further segregation. Thus, ... [the school board] can rebut the prima facie case only by showing that its past segregative acts did not create or contribute to the current segregated condition of [the schools].

*Id.* at 210–11, 93 S.Ct. at 2698–99. Proof that school authorities presently intend to maintain a segregated school system therefore is not required. "[T]he measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." *Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2971, 61 L.Ed.2d 720 (1979).

■ These cases make clear that no previously segregated school system can be declared to have achieved unitary status as long as there is continued segregation, as demonstrated by racial identification in faculty and staff assignments, extracurricular activities and facilities, *see Swann,* 402 U.S. at 18, 91 S.Ct. at 1277; *Green,* 391 U.S. at 435, 88 S.Ct. at 1692–93, and, to a lesser extent, student assignments, *see*

*Swann,* 402 U.S. at 26, 91 S.Ct. at 1281. Where it is possible to distinguish "black schools" from "white schools" on the basis of racial disproportionality in these highly visible areas, it is clear that the original desegregation plan has failed to achieve its objectives. A declaration of unitary status is also inappropriate when the evidence shows that the school authorities have not consistently acted in good faith to implement the objectives of the plan. *See Green,* 391 U.S. at 439, 88 S.Ct. at 1694–95 ("availability to the board of other more [desegregative] courses of action may indicate a lack of good faith [placing] a heavy burden upon the board to explain its preference for an apparently less effective method.").

■ The district court's determination that the Duval County school system has achieved unitary status is clearly erroneous.[3] The evidence showed that the larger schools in the system had administrative staffs composed exclusively of members of one race. The race of the staff in these schools almost without exception matched the predominant race of the student body. In the area of faculty assignments, the evidence showed that the Board has never complied with the 1969 injunction requiring teachers to be assigned according to a 70% to 30% white-to-black ratio at each school. Approximately thirty schools have varied consistently by more than 10% from the target ratio since 1972. Disproportionately black faculties were found at schools with predominantly black students. The same was true for department chairpersons and coaches.

The Board offers several explanations for these deviations from the *Mims* order. Mr. Herb Sang, the Duval County school superintendent, testified that the reasons for the overrepresentation of black administrators at predominantly black schools were that promotions were usually made within the schools and that consideration was given to administrators' preference in location when making assignments. As to the Board's failure to comply with the seventy to thirty ratio with respect to faculty assignments, appellee's witnesses testified that principals have the final authority to approve or disapprove any transfer. Teachers' preference in location was also cited as an explanation.

These "allegedly logical, racially neutral explanation[s]," *see Keyes,* 413 U.S. at 210, 93 S.Ct. at 2698, do not suffice to discharge the Board's burden of demonstrating that these disparities were not the result of the prior segregated system. The Board was required to show that "its past segregative acts did not create or contribute to the current segregated condition" of the schools. *Id.* at 211, 93 S.Ct. at 2699. Instead, the Board's evidence merely refuted the inference that the Board was presently engaging in intentionally discriminatory practices. This evidence does not defeat the presumption that the current imbalances are causally related to prior segregation. *See Brown v. Board of Educ.,* No. 87–1668, slip op. at 20 (10th Cir. June 2, 1989) (burden of rebutting presumption that current disparities are causally related to prior segregation rests on defendants) (citing *School Bd. v. Baliles,* 829 F.2d 1308, 1311 (4th Cir.1987)).

The evidence also revealed a failure to comply with the *Mims* order in the area of student assignments. Segregation in the district as a whole has increased since 1972. In that year, eight schools had majority black populations; in 1985, twenty-seven schools fell into that category. Appellant asserts that the district's use of portable classrooms and leasing of additional classroom space were partially responsible for this increased segregation. It is unnecessary for us to make a determination as to the actual effect of these practices, however, in light of the board's concession that no studies were conducted to assess their potential impact on the system's racial imbalances. The Board's failure to consider the objective of desegregation in its efforts

---

**3.** A declaration that a school has achieved unitary status is a finding of fact subject to review under the clearly erroneous standard. *United States v. Texas Educ. Agency,* 647 F.2d 504, 506 (5th Cir. Unit A 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); *accord Riddick v. School Bd.,* 784 F.2d 521, 533 (4th Cir.1986).

to alleviate overcrowding violates its affirmative duty to desegregate. *Pitts v. Freeman,* 755 F.2d 1423, 1427 (11th Cir. 1985).

██ Finally, there is no evidence to suggest that the racial imbalances in the gifted and EMH programs are vestiges of the prior de jure segregation.[4] "[D]espite any resulting numerical racial disproportionality, achievement grouping is permissible in a school district that has not been declared fully unitary 'if the school district can demonstrate that its assignment method is not based on the present results of past discrimination....' " *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1414 (11th Cir.1985), (quoting *McNeal v. Tate County School Dist.,* 508 F.2d 1017, 1020 (5th Cir.1975)). We are disturbed, however, by the overwhelming predominance of white teachers in the gifted program and consider this fact to be probative with respect to the district's faculty assignment practices.

In short, we hold that the Duval County School Board's consistent failure to comply with the provisions of the *Mims* injunction and order, as well as its actions and omissions in the areas of faculty and staff assignment, have perpetuated the effects of the prior system of segregation. The district court's determination that the school district has achieved the objectives of the injunction and order therefore was clearly erroneous. Accordingly, we reverse the finding of the district court that the Duval County school system has achieved unitary status, vacate its order dissolving the *Mims* injunction and remand for further proceedings consistent with this opinion.

REVERSED, VACATED and REMANDED.

---

4. Appellee asserts that appellant lacks standing to challenge the school system's exceptional education programs because no members of the NAACP who testified at trial were personally involved or had children who were involved in the programs. This contention is without merit. To have standing, an association is required only to allege injury to its members. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975).